**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

WIRELESS TOWERS, LLC,

                    Plaintiff,

vs.                                              Case No. 3:09-cv-676-J-32MCR

CITY OF JACKSONVILLE, FLORIDA,

                    Defendant.

_____

## <u>ORDER</u>

Plaintiff Wireless Towers ("Wireless")[1] has challenged the City of Jacksonville's (the "City") denial of its application to construct a wireless communications facility (more commonly known as a cell tower) as violative of the Federal Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 151 *et seq.* This case is before the Court on the parties' cross-motions for summary judgment (Docs. 19 & 20) and respective responses in opposition (Docs. 21 & 22). The Court heard oral argument on April 22, 2010, the record of which is incorporated by reference. (Doc. 23).

**I.    Background**

Wireless provides service to various licensed personal wireless telecommunications providers by locating, leasing, zoning, constructing, and owning personal wireless services facilities. (Doc. 1 ¶ 6). Provider Verizon Wireless requested construction of such a facility

_____

[1]    On November 24, 2009, Wireless was substituted as plaintiff in this action, replacing original plaintiff Anchor Tower, LLC ("Anchor"). (Doc. 8). Although Anchor was the actual applicant for the proposed cell tower at issue, the Court will refer to Wireless, as the current party in interest, as having been the applicant throughout.

to close a purported cellular service gap it was experiencing in northeast Jacksonville, Florida. Accordingly, Wireless proposed to erect a 160-foot Low Impact/Stealth Telecommunications Tower[2] (the "Proposed Tower") on an undeveloped parcel of land leased from the Spencer Engineering & Exploration Co., Inc. (the "Spencer Parcel").[3]

The Spencer Parcel is located on the south side of Cedar Point Road and is zoned Agriculture ("AGR"). The Pumpkin Hill Creek Preserve State Park (the "Park") is located across Cedar Point road to the north of the Spencer Parcel.[4] To the south, the Spencer Parcel borders marshlands of the Timucuan Ecological and Historical Preserve (the "Preserve"). Clapboard Creek, a Preserve waterway utilized by park-goers as a kayak trail, traces across this southern boundary in an east-west direction.[5] To the contiguous west of the Spencer Parcel are agricultural parcels of land also owned by the Spencer family; Bogey Branch, a tributary of Clapboard Creek and also a Preserve waterbody, runs in a north-south direction through these properties.[6] To the west of those parcels is the new Tidewater

---

[2] The low impact/stealth tower design selected by Wireless was a tapered, non-camouflaged monopole equipped with external, close-mounted antennas extending 24 inches from each face of the tower structure.

[3] The record is silent on whether alternative sites were available, considered or proposed. The Jacksonville Ordinance Code does not require an applicant to demonstrate that there is an actual coverage need in the area of the Proposed Site or that all other alternatives for placement have been exhausted.

[4] The Proposed Tower would be located approximately 800 feet south of Cedar Point Road.

[5] The Proposed Tower would be located approximately 1600 feet north of Clapboard Creek at its closest point.

[6] The Proposed Tower's nearest proximity to the Preserve is in the area of Bogey Branch, 510 feet due west. Despite traveling through private property, Bogey Branch and

subdivision, a 211 acre residential development approved for 398 homes.[7] The entire southern boundary of the Tidewater subdivision, including approximately 30 marshfront lots, abuts Clapboard Creek.

A.   *The Jacksonville Tower Ordinance*

Jacksonville Ordinance Code § 656.1501 *et seq.* (the "Tower Ordinance") sets out the applicable regulations for the location, design, and operation of cell towers within the City. A stated goal of the regulations is to "[p]rotect the natural features and aesthetic character of the City... with special attention to residential neighborhoods, public parks, transportation view corridors, historic districts, historic landmarks, and environmentally sensitive lands." Jacksonville Ordinance Code, § 656.1501(b). To ensure that this purpose is not frustrated, the City employs a three-part application review process.

A telecommunications company wishing to construct a cell tower must submit an application to the City.[8] Initially, a Planning Coordinator reviews the application for completeness. If complete, the application is forwarded to the Jacksonville Planning and Development Department (the "Planning Department"), which prepares a staff report

_____

its associated marshlands are within the boundaries of the Preserve.

[7]   The Tidewater subdivision, which is approximately 1,100 feet west of the Proposed Tower at its closest point, has been cleared and several homes have already been constructed.

[8]   The Tower Ordinance classifies cell towers as either Track I, Track II or Track III based on the design and location of the proposed tower. Each designation carries its own specific application requirements, which are set forth in Jacksonville Ordinance Code §§ 656.1505-1507, respectively. The Proposed Tower was designated as a Track II Low Impact/Stealth Tower, making § 656.1506 the applicable regulation in this case.

recommending denial or approval. Finally, the Jacksonville Planning Commission (the "Commission") holds a public hearing and makes a final determination on the application, which it memorializes in writing. The Commission is the ultimate decision-maker on tower applications.

Section 656.1506 of the Tower Ordinance, the provision applicable to Track II Towers such as the one proposed by Wireless, reads in pertinent part:

> ...The Commission shall approve, deny, or conditionally approve the application where it finds that the proposed tower (1) complies with the tower siting and design standards and performance standards of this Subpart; **and** (2) is compatible with the existing contiguous uses or zoning and compatible with the general character and aesthetics of the surrounding neighborhood or area, *considering* (a) the design and height of the wireless communication tower; **and** (b) the potential adverse impact upon any environmentally sensitive lands, historic districts or historic landmarks, public parks or transportation view corridors.
> . . .
>
> (b) Low impact/stealth towers. Except as set forth in Section 656.1514, Ordinance Code, low impact/stealth towers shall be permitted in all zoning districts, including Planned Unit Development Districts, subject to the following siting and design requirements:
>
> > (1) Height. . . No variance shall be required. . . where close-mount antennas are proposed to be located on that portion of a low impact/stealth tower in excess of 130 feet, so long as the overall tower height of the tower does not exceed 160 feet and the tower is located in a nonresidential zoning district.
> >
> > (2) Setbacks. . . Stealth towers shall also be set back a minimum distance of 250 feet or 200 percent of the tower height, whichever distance is greater, from the nearest boundary of a public park, historic district, historic landmark, Neighborhood Conservation District or environmentally sensitive lands, and a minimum distance of 100 feet from any transportation view corridor.

Jacksonville Ordinance Code § 656.1506 (emphasis added).

4

Thus, pursuant to § 656.1506, a successful Track II application requires the satisfaction of two criteria: one objective (compliance with siting, design and performance standards), and one subjective (compatibility with existing contiguous uses and the general character and aesthetics of the surrounding neighborhood or area). In making its subjective determination regarding compatibility, the Commission is instructed to consider both the design and height of the proposed tower and the potential adverse impact upon any environmentally sensitive lands or parks. If both the objective and subjective elements are satisfied, the Commission "shall approve" the application. If not, the Commission is vested with the authority to either conditionally approve or deny the application.

1.    *Application Process and Planning Department Report*

In accordance with § 656.1506, Wireless filed an application to construct the Proposed Tower on April 7, 2009. The application packet included, among other things, a series of photo simulations depicting selected views of the Proposed Tower from the areas surrounding the Spencer Parcel.[9] Four photographs, numbers 7, 13, 14, and 20, demonstrated various levels of visibility from the areas of Clapboard Creek (7), Bogey Branch (13 & 14), and Tidewater (20).

The Planning Department sent out requests to various agencies for comments on the Proposed Tower and the photo simulations. On April 27, 2009, Barbara Goodman of the National Park Service ("NPS"), which maintains the Preserve, returned a letter of concern

_____

[9]    The photo simulations were taken as part of a National Environmental Policy Act ("NEPA") assessment conducted on Wireless' behalf by Dr. Jeffrey Blick, an archeologist and consultant with Dynamic Environmental Associates. (Doc. 18, Ex. G-3).

to Bruce Lewis, Wireless Communications Coordinator for the Planning Department. Ms. Goodman stated that NPS staff had "examined the proposed site location and the[ ] photographs" and had concerns about the impact of the Proposed Tower on the viewshed of the Preserve. Specifically, Ms. Goodman stated that "the proposed tower placement will interfere with the views of park users. Those users would be boaters, kayakers, birdwatchers, fishermen, and others who would be on Clapboard Creek. Clapboard Creek is a prime location for aquatic users of the Preserve." Ms. Goodman also noted that Clapboard Creek has a public boat ramp and is a designated kayak trail of the Preserve; as support, she attached a brochure of the Preserve's kayak trail system.

Finding that the Proposed Tower met the objective tower siting, design and performance standards of § 656.1506,[10] the Planning Department nevertheless issued a staff report (the "Report") recommending denial on the grounds that the proposed tower design was not compatible with the existing contiguous uses and the general character and aesthetics of the surrounding area "when considering the size of the site, placement of the tower, residential uses and zoning in the area." (Doc. 18, Ex. B at 2). In making this determination, the Planning Department first considered the design of the Proposed Tower, concluding that the low-impact/stealth tower design – with its externally mounted antenna – "increases the visual profile of the tower." Id. The Planning Department next considered the height of the Proposed Tower in light of the chosen design. Noting that the trees on the Spencer Parcel stood an estimated 60 to 80 feet tall, the Planning Department found the 160

---

[10] It is undisputed that the Proposed Tower met the Tower Ordinance's siting, design and performance standards, including all applicable setbacks and height limits.

foot requested height to be "excessive for the area" as it would cause "the non-camouflaged tower to be more visible."[11]  Id.  Of specific concern to the Planning Department was the Proposed Tower's visibility to the south and west, where the vegetation consisted of marsh with shorter, scattered trees with minimal density.  On this point, the Report stated: "[i]n this instance the placement of the tower makes it more visible to the west where there is a large subdivision [Tidewater]."  Id.  Regarding the Proposed Tower's proximity to and visibility from Tidewater, the Planning Department noted that "[a]ll [of the Tidewater] lots have been cleared of vegetation except for jurisdictional wetlands.  The lack of existing trees increases the visibility of the proposed tower.  Photo simulation #20 indicates the proposed tower will rise above the tree line and be clearly visible to those residents in the Tidewater subdivision."  Id.

The Planning Department next addressed the potential adverse impact of the Proposed Tower on the Preserve, an environmentally sensitive land within the definition of the Tower Ordinance, and found that the tower's demonstrated visibility from Clapboard Creek and Bogey Branch rendered it incompatible with the character and aesthetics of the surrounding area.  The Report cited Ms. Goodman's concern that the tower would interfere with the views of Clapboard Creek users.  Specifically, the Planning Department noted that "[p]hoto simulations #13, #14, and #20 provided by the applicant confirm the visibility from

_____

[11]     The 160 foot requested height was the maximum allowed by the Tower Ordinance for the location in question.  See Jacksonville Ordinance Code § 656.1506(b)(1).  Despite finding the requested height excessive, the Planning Department did concede that a tower must extend above the tree line to operate efficiently.

Clapboard Creek marshlands.[12]  Clapboard Creek is listed on the Preserve's website as a

designated kayak trail.  In conjunction with a parcel owned by the North Florida Land Trust,

the Clapboard Creek kayak trail that begins at Palms Fish Camp could have a northern

launch point."  (Doc. 18, Ex. B at 3).

The Planning Department also stressed the Preserve's designation by the Timucuan

Management Plan (the "Plan") as a Special Management Area ("SMA"), and quoted the

Plan's objective for such designation as the protection of "natural views within the [P]reserve

that are now unimpaired by permanent manmade elements in order to allow the public to

experience the pristine, natural character of these portions of the [P]reserve."[13]  Id. at 3.

After reiterating that Wireless was proposing to build an uncamouflaged tower with clearly

visible antennas, the Planning Department concluded:

> As the tower will be viewed from Clapboard Creek/Bogey Creek [sic], it will be
> a permanent manmade intrusion and affect the natural character of the
> Preserve.  The proposed tower will detract from the scenic viewshed the
> Preserve is intended to protect.  The tower design is not significantly
> camouflaged to reduce its visual impact to the surrounding area.

Id. at 4.

---

[12]  Photographs #13 and #14 are more accurately described as the view from Bogey
Branch, not Clapboard Creek.  (Doc. 21 at 3).  As mentioned previously, however, Bogey
Branch is a tributary of Clapboard Creek and is, along with its associated marshlands, within
the boundary of the Preserve.  (Doc. 19 at 5-6).

[13]  The Report also cited a letter received from the Florida State Historic Preservation
Office ("SHPO") requesting that the "cell tower be placed at a sufficient distance from the
Preserve so as not to adversely affect the natural viewshed."  (Doc. 18, Ex. B at 4).
Subsequent to its initial letter, the SHPO reviewed the photo simulations and Dr. Blick's
NEPA assessment and determined that construction of the Proposed Tower would have "no
adverse effect" on historic properties in the area.  Id.

2. *The Public Hearing*

On June 25, 2009, the Commission considered Verizon's application at a public hearing. (Doc. 18, Ex. M). Mr. Lewis spoke first on behalf of the Planning Department and reiterated the Report nearly verbatim. The Planning Department presented no further evidence in opposition to Wireless' application, and no citizens testified for or against the Proposed Tower.

To rebut the Planning Department's recommendation, Wireless presented the testimony of Dr. Blick, who spoke about the NEPA assessment his firm had performed on behalf of Wireless. Dr. Blick noted that the NEPA assessment called for an evaluation of both the direct and visual impact of the Proposed Tower on the Preserve, and that a photo simulation analysis of a two and a half mile radius was performed to address the visual impact. Dr. Blick reaffirmed his assessment that the Proposed Tower would have no adverse effect on the Preserve, and noted that the SHPO had concurred with this finding after reviewing both his report and the photo simulations.

Dr. Blick then went through each of the photo simulations for the Commission. When he arrived at photo 13, Dr. Blick noted that "[t]his is probably one that's causing... one of the greatest problems here." (Doc. 18, Ex. M at 26). He acknowledged that the tower was "partially visible," and that "about a third, approximately, of the tower protrudes above the tree line" from the Bogey Branch location. Id. Dr. Blick also conceded that approximately ten percent of the Proposed Tower was visible in photo 14 from Bogey Branch, and a similar percentage was visible in photo 20 from the Tidewater subdivision. The Commission had no questions for Dr. Blick.

Mary Solik, Wireless' attorney, then argued that the NPS's objection to the Proposed Tower was an attempt to regulate lands that did not fall under its protection, something that was inconsistent with the City's Comprehensive Plan. However, Ms. Solik conceded that the NPS was a "neighbor" of the Spencer Parcel, and agreed with Commissioner Hardesty's contention that "a neighbor can certainly voice their opinion as to the impact on their particular property, just like any neighbor in any other zoning situation." Id. at 31. Ms. Solik next commented on the Planning Department's concern that the Proposed Tower was visible from Tidewater. She noted that the subdivision, which was approved by the City in 2003, called for 30 lots located directly on Clapboard Creek, and stated "it's hard for me to understand why that's not objectionable and why that doesn't impair the experience of the kayakers and fishermen on Clapboard Creek and just a little bit of the tower visible from nearly 2,000 feet away [does]." Id. at 37. Ms. Solik also argued that the tower would serve the public benefit of providing cell service to users of the Preserve, and concluded "[s]o, yes, you can see the tower from Clapboard Creek, you can see a small portion of it, but there is a public benefit to having it out there as well." Id. at 39.

Ms. Solik then introduced Wireless client representative Mike Burkhead, who spoke about the need for a 160 foot tower. He noted that the height was customer-driven, and that Verizon, the anchor tenant for the Proposed Tower, had actually requested a larger tower before being informed that Wireless was limited to 160 feet by the Tower Ordinance. Chairman Register asked Mr. Burkhead a series of questions regarding the relationship between the coverage footprint and the height of the Proposed Tower. Mr. Burkhead testified that the lower the height – dependent upon topography and the number of providers

on the tower – the smaller the coverage circle would be.  When asked about the effective range of the tower at 130 feet, Mr. Burkhead replied: "I can't say for sure.  I'm not an RF engineer that can give you a professional opinion, but significantly – [Verizon] most likely will not collocate on the tower is what [has] been told to us."  Id. at 45.  With no additional questions for Mr. Burkhead, Ms. Solik concluded her presentation with an offer to drop the height of the Proposed Tower to 150 feet.

Commissioner Hardesty then made a motion to deny the application "based on the Staff Report and the competent substantial evidence contained therein."  Id. at 48-49.  The motion was seconded, after which the Commissioners discussed the significance, if any, that Tidewater's impact on Clapboard Creek should have on their consideration of Wireless' application.  Commissioner Edwards stated that he had "a hard time denying one [the Proposed Tower] with that other one [Tidewater] sitting there."  Id. at 50.  Commissioner Hardesty disagreed, arguing that such an approach would require the Commission to follow bad planning decisions with further bad planning decisions, and that the better course of action was to consider Wireless' application on its own merits without regard to Tidewater's impact.

Commissioner Hines asked whether a camouflage tower had been considered.  Ms. Solik replied that during its application review, the Planning Department had requested that Wireless utilize a unipole[14] and also drop the requested height, but that Wireless could not

_____

[14]    A unipole is a flag-pole like design with the antennas internally mounted.  Regarding the potential for a pine tree camouflaged design, Ms. Solik opined: "I think a tree out there would be worse."  Id. at 52.

accommodate both requests.  After a brief consultation with her client, Ms. Solik advised that she was authorized to offer a unipole.[15]

Chairman Register then asked the Planning Department staff whether the use of a unipole would change their recommendation.  Sean Kelly, Chief, Current Planning Department, stated that

> We would not be supportive of even a reduced impact tower like that.  Well, number one, I'll state again, just going back to the photo sims that were submitted as part of the application, specifically 13, 20, and 7, whereas the visibility of the tower is clearly incompatible with the surrounding land uses.  It sticks out way above any other object or the tree line for that matter. Again, it's just incompatible as viewed from the areas within the Special Management Area, is clearly contrary to the intent of the Management Plan and that objective regarding protecting view corridors and the department is not supportive.

Id. at. 54.  The Commissioners offered no further comment, and voted four to two for denial. The same day, the Commission issued an order denying Verizon's application (the "Order"), which incorporated the findings and recommendations of the Report.[16]  (Doc. 18, Ex. A-1). The official basis for denial, as stated in paragraph 4 of the Order, was: "The proposed tower design is not compatible with the existing contiguous uses or zoning and is incompatible with the general character and aesthetics of the surrounding neighborhood and area."  Id. at 1.

Wireless then filed suit under the Act, alleging that the Commission's decision was not supported by substantial evidence contained in a written record as required by 47 U.S.C.

---

[15]  It is unclear from the record whether this offer was in addition to – or an alternative to – Ms. Solik's earlier offer to drop the tower height to 150 feet.

[16]  The Commission's Order denying Wireless' application constitutes a final action of the City.  Jacksonville Ordinance Code, § 656.1506(d)(6); see Preferred Sites, LLC v. Troup County, 296 F.3d 1210, 1217 (11th Cir. 2002).

§ 332(c)(7)(B)(iii).  In its complaint, Wireless seeks both a declaratory judgment and a permanent mandatory injunction requiring the City to approve its application.  As the record before this Court is fixed and the facts are not in significant dispute, the parties have agreed that this case is appropriate for adjudication on cross-motions for summary judgment.

## II.    Discussion

### A.    *The Federal Telecommunications Act of 1996*

Congress enacted the Act to "promote competition and higher quality in American telecommunications services and 'to encourage the rapid deployment of new telecommunications technologies.'"  Michael Linet, Inc. v. Village of Wellington, Fla., 408 F.3d 757, 761 (11th Cir. 2005) (quoting City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 115 (2005)).  "With respect to the construction of telecommunications facilities, Congress recognized zoning decisions by state and local governments had created an inconsistent array of requirements, which inhibited both the deployment of personal communications services and the rebuilding of a digital technology-based cellular telecommunications network."  Preferred Sites, 296 F.3d at 1214.  Despite this, "Congress also acknowledged 'there are legitimate State and local concerns involved in regulating the siting of such facilities,'" Id. (quoting H.R.Rep. No. 104-204, at 94-95 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 61), and drafted the Act so as to "'preserve[ ] the authority of State and local governments over zoning and land use matters except in... limited circumstances.'" Id. (quoting H.R.Rep. No. 104-458, at 207-08 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 222).

The Act was therefore designed to "strike a balance between 'two competing aims –

to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.'" Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529, 531 (2d Cir. 2005)(quoting Town of Amherst, N.H. v. Omnipoint Commc'ns, 173 F.3d 9, 13 (1st Cir. 1999)). Thus, while local authorities retain the authority to regulate the placement and construction of towers, "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing[17] *and supported by substantial evidence contained in a written record.*" 47 U.S.C. § 332(c)(7)(B)(iii) (emphasis added).[18]

"[T]he 'substantial evidence' standard [under the Act] is the traditional substantial evidence standard used by courts to review agency decisions." Linet, 408 F.3d at 762. This standard has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal citation and quotation omitted). As such, substantial evidence is "more than a mere scintilla but less than a preponderance." Id.

_____

[17] This Court has found that the ruling body's incorporation of another department's written recommendations is sufficient to support the Act's "in writing" requirements. See T-Mobile South LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1344-45 (M.D. Fla. 2008).

[18] The Act also provides that while local authorities retain the authority to regulate the placement and construction of towers, such regulation "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Though the Eleventh Circuit has not yet addressed the issue, other circuits have held that "a locality can run afoul of the [Act]'s 'effective prohibition' clause if it prevents a wireless provider from closing a 'significant gap' in service coverage." Sprint PCS Assets, LLC v. City of Palos Verdes Estates, 583 F.3d 716, 726 (9th Cir. 2009)(citation and quotation omitted); see also APT Pittsburg Ltd. Partnership v. Penn Tp. Butler County of Pa., 196 F.3d 469, 480 (3d Cir. 1999); Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999). Here, Wireless does not rely on this provision of the Act.

(internal citation and quotation omitted). In utilizing this standard, a court may not substitute its own judgment for that of the local governing body. Preferred Sites, 296 F.3d at 1218. The party seeking to overturn the governing body's decision bears the burden of showing that the decision is not supported by substantial evidence. American Tower LP v. City of Huntsville, 295 F.3d 1203, 1207 (11th Cir. 2002).

B. *Propriety of Denial on the Basis of Aesthetics*

As it is undisputed that Wireless' application complied with the objective standards of § 656.1506, this Court's inquiry is limited to whether there was substantial evidence to support the Commission's conclusion that the Proposed Tower is not compatible with existing contiguous uses and zoning and with the general character and aesthetics of the surrounding neighborhood or area. The relevant "record" within the meaning of § 332(c)(7)(B)(iii) is the "written record of all the evidence before the governing body at the time the decision was made." Vertex Development, LLC v. Marion County, Fla., 2008 WL 2994259 at *13 (M.D. Fla. Aug. 1, 2008) (citations omitted). The City contends that the Report, the photo simulations of the Proposed Tower, and Ms. Goodman's letter expressing concern about its impact on the viewshed of the Preserve constitute substantial evidence supporting the Commission's decision. Wireless disagrees, arguing that "mere visibility, with no other evidence, does not equate to 'material adverse visual impact' sufficient to support a denial." (Doc. 19 at 14).

The Eleventh Circuit has determined that "[a]esthetic concerns may be a valid basis for denial of a permit *if* substantial evidence of the visual impact of the tower is before the [governing body]." Preferred Sites, 296 F.3d at 1219 (emphasis in original). This Court

15

recently analyzed the relevant Eleventh Circuit case law regarding the sufficiency of evidence required to support denial of a cell tower application based on subjective aesthetic reasons. See Verizon Wireless Personal Commc'ns, L.P. v. City of Jacksonville, Fla., 670 F. Supp. 2d 1330, 1338-41 (M.D. Fla. 2009). After its review of the controlling cases, this Court concluded in Verizon that "aesthetic concerns *can* be a valid basis for denial of a permit by a local governing body, *so long as* a judgment based on those concerns is supported by objective facts or evidence.[19]" Id. at 1341 (emphasis and footnote in original).

This case and Verizon involve very similar facts. In Verizon, the Commission adopted the Planning Department's finding that the proposed tower was incompatible with the surrounding area – specifically, the Park and Preserve – based on concerns that the tower would adversely impact the viewsheds of these environmentally sensitive lands. Id. at 1335-36. The question before the Court, as in this case, was whether the requisite factual basis was before the Commission to constitute substantial evidence supporting the Commission's denial on these aesthetic grounds.[20] Id. at 1341. This Court found no objective evidence to support the conclusion that Verizon's proposed tower would actually be within the viewscape of the Park or Preserve. Id. at 1343. The only evidence before both the Planning

---

[19] "It may seem anomalous to require 'objective' evidence of aesthetic concerns, particularly if one ascribes to the view that 'beauty is in the eye of the beholder.' However, what the courts are saying is that there must be some actual evidence of adverse visual impact before a local government can deny a cell tower application solely on aesthetic grounds."

[20] In Verizon, this Court found Southeast Towers, LLC v. Pickens County, Ga., 625 F. Supp. 2d 1293 (N.D. Ga. 2008), to be the most instructive case for a scenario where the aesthetic concern in question is a proposed tower's visual impact. Verizon, 670 F. Supp. 2d at 1341-43 (analyzing Southeast Towers).

Department and Commission regarding this viewscape – a balloon test which demonstrated no visual impact on either the Park or Preserve – was to the contrary.  Id.  In addition, this Court rejected the City's contention that certain photo simulations were relied upon to support denial of Verizon's application, citing the failure of both the Planning Department and the Commission to mention them in the staff report, at the hearing, or in the order of denial. Id. at 1344.  While sympathetic to the City's objective of protecting the pristine nature of the Park and Preserve, this Court concluded that "before the City can deny – based on aesthetics – an application that undisputedly meets all siting, zoning, and design criteria, it must have evidence that [the sensitive] areas would *actually* be impacted, rather than relying on speculative concerns about the proposed tower's potential visibility."  Id. at 1342-43 (emphasis in original).

> C.    *The Court's Decision*

Under the Act's substantial evidence standard, review of a local government's decision to deny a cell tower application is colored by the requirements of the local zoning ordinance.  Wireless Towers, LLC v. St. Johns County, Fla., — F. Supp. 2d ----, 2010 WL 455285 at *11 (M.D. Fla. 2010) (citing T-Mobile South, LLC v. Coweta County, Ga., 2009 WL 596012 at *7 (N.D.Ga. 2009)).  Thus, "[w]hen evaluating the evidence [supporting the denial], local and state zoning laws govern the weight to be given the evidence" and the Act does not "affect or encroach upon the substantive standards to be applied under established principals of state and local law."  Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 494 (2d Cir. 1999).  Under this framework, this Court has the difficult task of scrutinizing the Commission's subjective determination of incompatibility (based upon the factors set forth

in § 656.1506 of the Tower Ordinance)[21] for "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Linet, 408 F.3d at 762 (internal citation and quotation omitted). This evidentiary hurdle is a low one, given the wide discretion afforded the Commission by § 656.1506. As this Court stated in Verizon, "before the City can deny a cell tower application based solely on aesthetic concerns such as visual impact, the Act requires that it muster some (even if not much) real evidence of that impact." Verizon, 670 F. Supp. 2d at 1345.

The City has done in this case what it failed to do in Verizon. The Planning Department and the Commission reviewed the photo simulations provided by Wireless and determined – as argued by the "concerned neighbor," NPS – that the Proposed Tower would have an adverse visual impact on the surrounding area. The Planning Department cited specifically to photographs 7, 13 and 14 in concurring with Ms. Goodman as to the adverse impact of the Proposed Tower on the Preserve,[22] and also noted that photograph 20 demonstrated an adverse impact upon the Tidewater subdivision. Dr. Blick conceded that some of the views were problematic, and acknowledged that over a third of the tower would

_____

[21] It should be noted that Wireless is not contesting the validity of the Tower Ordinance, only whether the Commission's determination of incompatibility under the Ordinance was supported by substantial evidence.

[22] Wireless contended for the first time at oral argument that there was no evidence before the Commission that kayakers actually utilize the areas of the Preserve from which the Proposed Tower would be most visible. However, what the Commission had before it was evidence that Clapboard Creek, from which the Proposed Tower was undisputedly visible, was a designated kayak trail of the Preserve, as well as evidence that the Proposed Tower would be highly visible from Bogey Branch, another Preserve waterbody available to its "aquatic users," i.e., fishermen, birdwatchers, and boaters. Thus, the Court finds Wireless' newfound argument unconvincing.

be visible from Clapboard Creek's tributary, Bogey Branch. With this objective evidence before it, the Commission made a subjective determination that the Proposed Tower was incompatible with the surrounding area given its height, design, and the sensitivity of the affected land.[23]

Wireless contends that mere visibility of the tower from the Preserve is insufficient to uphold the Commission's aesthetic denial and that some element of "materiality" is required. See Southeast Towers, 625 F. Supp. 2d at 1304 (finding that the local government's denial "was not based merely upon general objections to the aesthetic appeal of a telecommunications tower; rather, photographs and specific supporting testimony demonstrated that the proposed tower would have a *specific and material impact*")(emphasis added). However, the Tower Ordinance makes clear that protecting the viewshed of environmentally sensitive lands such as the Preserve is an objective of the City when considering cell tower applications.[24] Thus, while mere visibility of a tower from a distance in a busy urban area arguably might not create a "material" impact which would rise above "mere generalized concerns regarding aesthetics," Preferred Sites, 296 F.3d at 1210, visibility from the Preserve, an area which the City is trying to keep pristine, satisfies any

---

[23] Thus, despite the contrary conclusions of Dr. Blick and the SHPO as to potential visual impact, the Commission "resolved the conflict concerning whether the proposed cell phone tower would have a material visual impact on the [Preserve] in favor of the individuals and organizations opposing the permit." See Southeast Towers, 625 F. Supp. 2d at 1298.

[24] See Jacksonville Ordinance Code § 656.501(b); supra pg. 3.

"materiality" requirement.[25]

The Commission found that the Proposed Tower's visual impact upon Clapboard Creek and Bogey Branch was significant enough to warrant denial of Wireless' application, a decision supported by photographic evidence. Faced with objective evidence of the visual impact (which evidence was absent in Verizon), this Court cannot displace the Commission's "fair estimate of conflicting evidence" and cannot "freely re-weigh the evidence." American Tower, 295 F.3d at 1209 n.8. Rather, the Court can "only determine whether substantial evidence exists to the support the [Commission's] decision." Id. Here, the City has "muster[ed] some (even if not much) real evidence of [visual] impact." Verizon, 670 F.Supp. 2d at 1345. The Court concludes on the record before it that the Commission's decision was supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[26] Linet, 408 F.3d at 762.

――――――――――――――――

[25] The Court does not determine here whether a finding of "materiality" is actually required. Moreover, to the extent that the Eleventh Circuit intimated in Linet that something more than just visibility is required to uphold an aesthetic denial, see Linet, 408 F.3d at 761 ("[a]esthetic objections coupled with evidence of an adverse impact on property values or safety concerns can constitute substantial evidence"), the Court is of the opinion that a demonstrated impact upon the viewshed of environmentally sensitive lands – which cannot be valued in the same manner as residential properties – is sufficient.

[26] The Commission's rejection of Wireless' offer to alter the height and design of the Proposed Tower does not change this result. Though both offers were made, it was unclear whether they were intended to be mutually exclusive. As Ms. Solik noted at the hearing, when the Planning Department requested both adjustments during its review phase, Wireless informed the city that it could not "do both." (Doc. 18, Ex. M at 52). In addition, when Chairman Register asked whether a 130 foot height was a possibility, Mr. Burkhead intimated that Verizon, the anchor tenant, would likely not utilize a tower of that height. Id. at 45. Absent other evidence to the contrary, and given that the Proposed Tower would undisputedly still have been visible from both the Preserve and Tidewater at 150 feet, the Commission was within its purview to determine that such alterations would not change the

### III. Conclusion

Wireless notes that placement of the Proposed Tower on the Spencer Parcel meets the Tower Ordinance's setback requirements from environmentally sensitive lands and that the Tower Ordinance does not require that towers be "invisible" from those lands. It contends that the Commission's ability to deny an otherwise valid application on subjective aesthetic grounds subjects applicants to uncertainty and confusion, especially where the City fails to inform applicants of more stringent, unwritten requirements for areas it has decided to protect from any visual impact, such as the Preserve.

This Court is not unsympathetic to the difficulty an applicant has in meeting the aesthetic standard of § 656.1506, especially where opinions as to "adverse impact" and "compatibility" can differ. However, subjective though the standard may be, it is similar to other subjective determinations that local zoning and land use bodies routinely make. In any event, pursuant to the Tower Ordinance, the Commission properly considered the Proposed Tower's "potential adverse impact" on the Preserve and made a subjective determination, supported by objective evidence, that the Proposed Tower was aesthetically incompatible with the surrounding area. In this circumstance, the Federal Telecommunications Act was not violated by that decision.

Accordingly, it is hereby

**ORDERED**:

1. Defendant City of Jacksonville's Motion for Summary Judgment (Doc. 20) is

---

Proposed Tower's adverse impact.

**GRANTED**.

    2.  Plaintiff Wireless Towers, LLC's Motion for Summary Judgment (Doc. 19) is **DENIED**.

    3.  The Clerk shall enter judgment for the City of Jacksonville and against Wireless Towers, LLC, and close the file.

    **DONE AND ORDERED** at Jacksonville, Florida this 11th day of May, 2010.

TIMOTHY J. CORRIGAN
United States District Judge

jmm.
Copies:
counsel of record